AFFILIATED HOSPITALS CENTER, INC. *vs.* RATE SETTING COMMISSION.

Suffolk. March 15, 1979. — May 16, 1979.

Present: BROWN, GREANEY, & DREBEN, JJ.

*Administrative Law*, Rate setting, Agency's interpretation of statute. *Hospital*, Hospital charge control regulation, Costs.

An action by a hospital challenging a hospital charge control regulation promulgated by the Rate Setting Commission on the grounds that the regulation's use of a two year old base for an analysis of "budget year" calculations amounted to retroactive rate setting and that it failed to recognize certain costs in its calculations was not rendered moot by the fact that the regulation had been superseded by an entirely different regulation where the commission still used a base year two years before the budget year in its rate setting formula and failed to recognize certain costs. [568-569]

The Rate Setting Commission's use of a base year at least two years old for calculation of total patient care costs in order to determine the propriety of modification of hospital charges and budgets did not violate the provisions of St. 1976, c. 409. [570-571]

The Rate Setting Commission was not required by St. 1976, c. 409, to recognize all of a hospital's actual costs in determining "total patient care costs" for rate setting purposes, nor was it required by § 5 of the statute to recognize all costs reimbursed by Medicare. [572-577]

The methodology applied by the Rate Setting Commission to determine the propriety of modification of hospital charges and budgets pursuant to St. 1976, c. 409, was prospective in operation despite the use of historical and adjusted data. [577-579]

CIVIL ACTION commenced in the Superior Court on July 20, 1977.

The case was heard by *D'Ambrosio, J.,* a District Court judge sitting under statutory authority.

*Jeffrey L. Heidt (Harris G. Gorab* with him) for the plaintiff.

*Margot Botsford,* Assistant Attorney General (*S. Stephen Rosenfeld,* Assistant Attorney General, with her) for the defendant.

GREANEY, J. Affiliated Hospitals Center, Inc. (Affiliated), appeals from a judgment entered in the Superior Court denying further injunctive and declaratory relief pursuant to G. L. c. 231A, § 5. In its complaint, Affiliated asserts that a certain hospital charge control regulation[1] promulgated by the Rate Setting Commission (Commission) under G. L. c. 6A, § 37, inserted by St. 1976, c. 409, § 4, violates both the provisions of that statute and a previous judgment entered in a prior action between the parties.[2] We find that the regulation was valid and, as a result, affirm the present judgment.

We summarize the facts necessary to an understanding of the issues, drawing our summary from the undisputed findings of fact made by the judge.

Affiliated is a Massachusetts nonprofit hospital corporation licensed by the Department of Public Health un-

---

[1] The regulation in question is identified by the Commission as 14 CHSR 11 (1977), and is contained in 77 Mass. Reg. 75 et seq. (1977).

[2] Affiliated Hospitals Center, Inc. *vs.* Weiner, Superior Court, Suffolk County, C.A. No. 19457 (1977). (*Affiliated I*). The judgment in that action permanently enjoined portions of the Commission's former regulation, 14 CHSR 9, 31 Mass. Reg. 26 et seq. (1976), which provided for "recapture" of a hospital's excess revenue from charges provisionally approved by the Commission before the actual cost data were available. The judge in *Affiliated I* ruled that "[t]he entire structure of c. 409, and of the predecessor statute, c. 424, is that of an unconditionally prospective system of charge modification application and permanent approval . . . Commission action is limited to approval or disapproval in whole or in part. Absolutely no provision is made for tentative or conditional approval" [of rates].

der G. L. c. 111, § 51. Located in Boston, it operates three divisions which are treated separately for purposes of budget review and charge control by the Commission under the regulation in issue: the Peter Bent Brigham Hospital Division, the Robert B. Brigham Hospital Division, and the Boston Hospital for Women Division. Seventy-three per cent of Affiliated's patients have their hospital services paid for on a cost reimbursement basis[3] by the following third parties: the United States Department of Health, Education and Welfare, (Medicare Program);[4] the Commonwealth of Massachusetts, (Medicaid Program[5]); Blue Cross of Massachusetts; the Harvard Community Health Plan; and the National Institutes of Health. The remaining 27% of Affiliated's patients either pay their own bills or have their hospital charges covered by commercial insurance companies.[6] Patients in this latter group are Affiliated's sole source of reimbursement for charges in excess of costs, and generate the income used to cover the hospitals' bad debts and free care not ordinarily included in third-party contracts.[7]

Since 1975, among its other responsibilities, the Commission has been required under certain statutory mandates, to review hospital costs, charges, and budgets, and to promulgate regulations necessary to accomplish such

---

[3] To the extent that charges for such patients exceed the cost for services as defined by these third parties, the hospital is not reimbursed for services rendered. See generally 42 U.S.C. § 1395 et seq., § 1396 et seq. (1976), and regulations adopted thereunder.

[4] 42 U.S.C. § 1395 (1976).

[5] 42 U.S.C. § 1396 (1976).

[6] Affiliated also includes in this percentage its "bad debts," those patients who cannot, or do not, pay their bills; however, no figures were introduced as to the number of these patients Affiliated had during the fiscal year in question.

[7] The evidence indicated that Blue Cross allows a bad debt write-off proportional to the percentage of patient services provided to Blue Cross patients, while the other third-party contractors do not permit any write-off or deduction for a hospital's bad debts.

review.[8] The Commission reviews a hospital's costs, charges, and budget for a particular fiscal year, which, in the case of private hospitals, such as those conducted by Affiliated, runs from October first of one year to September thirtieth of the next. At issue in this case is the Commission's methodology in its regulation 14 CHSR 11 in reviewing Affiliated's costs and charges for fiscal year (FY) 1978.[9] This regulation permits the Commission to approve a hospital's proposed charge modifications and FY 1978 proposed budget only if its ratio of total patient care costs to total patient care charges for FY 1978 is not lower than 95% or the historic ratio which the hospital had when St. 1975, c. 424, regulating hospital rates first went into effect.[10] Affiliated's objections center on the definition and methodology by which the Commission establishes a hospital's "total patient care costs" and the consequent cost-to-charge ratio. "Total patient care costs" under St. 1976, c. 409, § 5, are designated as "total patient care cost as defined for purposes of Title XVIII . . . of the federal Social Security Act (42 U.S.C. 1395 et seq. [1976] [Medicare])."[11] This definition was found by the

[8] See St. 1975, c. 424, which established a temporary system for the review of hospital charges by the Commission. It was superseded by St. 1976, c. 409, providing for a permanent system of review.

[9] Affiliated's FY 1978 runs from October 1, 1977, to September 30, 1978.

[10] Both St. 1975, c. 424, and St. 1976, c. 409, refer to the "base period" as "the twelve month period from April first, nineteen hundred and seventy four, through March thirty-first, nineteen hundred and seventy-five," which is the "ratio year" for purposes of the regulation, 14 CHSR 11, § 11.17; the hospital's historic cost-to-charge ratio becomes the "ratio year ratio," 14 CHSR 11, § 11.21. Affiliated's three divisions have the following "ratio year ratios": Peter Bent Brigham — 88.34%; Robert B. Brigham—90.97%; Boston Hospital for Women — 95%.

[11] Section 5 of c. 409, further orders the Commission to adopt its own definitions of "total patient care costs" and "total patient care charges" not later than October 1, 1978, and provides that after this occurs "the provisions of section thirty-seven of chapter six A of the General Laws, inserted by section four of this act, relating to the ratio of total patient care costs to total patient care charges shall become

judge to pipe the Commission in to some extent with Medicare's system for paying hospital costs. Medicare reimburses hospitals at tentative rates during the year for all actual patient costs falling within certain categories, so long as the costs are found to be reasonable according to Medicare regulations.[12] These interim payments are then adjusted retroactively at the end of the accounting period.[13] The Medicare audit which becomes the basis for the final rate settlement for Medicare charges for a given fiscal year takes place six months to one year after the close of the fiscal year. Thus, at the time of the Commission's review of FY 1978 hospital budgets, no hospital's allowed costs under Medicare for FY 1977 or FY 1978 had yet been determined. Only a hospital's FY 1976 Medicare allowed costs as finally audited were available to the Commission.

By a complicated system of calculations (discussed in detail later in this opinion) the Commission employed the Medicare allowed costs for FY 1976 as a key statistic along with various projections and indices to arrive at "total patient care costs" for FY 1978. Although Affiliated had not received notification from the Commission at the time of the trial as to the approval or disapproval of its FY 1978 budget, it had completed the forms required by 14 CHSR 11 (using two year old base figures). In addition, Affiliated had also calculated its budget as if the Commission's prior regulation, 14 CHSR 9 were still in effect (using one year old base figures).[14] Thus Affiliated

void . . . ." However, for FY 1978, the statutory definitions still applied.

[12] See generally 20 C.F.R. 405.402, 405.403 (1977).

[13] 20 C.F.R. 405.405 (1977).

[14] There was evidence that the Commission instituted a two year old "base year" after the recapture provisions of 14 CHSR 9 were enjoined by the judgment in *Affiliated I* because the one year old base year relied heavily on projections and estimates in place of actual audited figures. The Commission explained that the use of such projections was adequate if it could reopen the tentative rates after actual data

claimed that the maximum "total patient care costs" for the Peter Bent Brigham Hospital Division for FY 1978 using 14 CHSR 11 calculations were $57,819,287, while its estimated actual costs (which initially would have been allowed under 14 CHSR 9) were $59,690,000. Affiliated claimed that the Commission's change in methodology from 14 CHSR 9 to 14 CHSR 11 caused it to lose $1,870,713.

After finding these facts and considering the relevant statutes and regulations, the judge concluded that the regulations contained in 14 CHSR established a prospective rate setting system which did not violate the judgment in *Affiliated I*; that the provisions of 14 CHSR which govern the definition of "total patient care cost" and the calculation of the FY 1978 cost-to-charge ratio were a reasonable administrative interpretation of the underlying statute; and that 14 CHSR 11 did not violate the statutory directives that put the Commission to rate setting in this area. We agree, and proceed to a detailed analysis of the statute and regulations in the context of the claims raised by the parties.

1. *Mootness.* The Commission first contends that the case is moot because 14 CHSR 11 (1977) has been superseded for FY 1979 by an entirely different regulation, as required by St. 1976, c. 409, § 5.[15] However, the Commission concedes that its new regulation continues to use a base year two years before the budget year as its starting point in the rate setting formula, and that certain actual costs incurred by the hospital will still go unrecognized under the new calculations as they did in the past. Further, Affiliated's complaint, boiled down to basics,

were available, but when this avenue was foreclosed by the *Affiliated I* judgment, it initiated a two year old base year as the starting point for its computations in order to build into its calculations the most recent available actual cost data.

[15] 114.1 Code Mass. Regs. 8.00, 124 Mass. Reg. 102 (1978); 125 Mass. Reg. 141 (1978); 137 Mass. Reg. 40 (1978).

amounts to a claim that utilization of a two year old base as the beginning point for an analysis of "budget year" calculations amounts to retroactive rate setting, and that the Commission is still failing to recognize in its formulations all the costs for which Medicare should reimburse Affiliated. Thus, although the statutory scheme has changed for review of FY 1979 budgets, and the challenged regulation is no longer in effect, the underlying dispute between the parties is very much alive.[16] In view of the fact that the parties have fully briefed the issues, and because it is apparent that the questions raised are likely to arise again in the reasonably near future, possibly still evading judicial review at that time if the Commission has shifted to still another regulation, we determine that the case is not moot and that it is appropriate to reach the merits. *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943). *Wolf* v. *Commissioner of Pub. Welfare*, 367 Mass. 293, 298-299 (1975). *Boston Edison Co.* v. *Department of Pub. Util.*, 375 Mass. 1, 6 (1978).

2. *The statute.* Affiliated asserts that the methodology adopted by the Commission to define "total patient care charges" under 14 CHSR 11 impermissibly clashes with the provisions of St. 1976, c. 409, in three respects: (a) the regulation improperly begins its calculation with a two year old base (i.e. 1976) which is not authorized by the statute; (b) the regulation does not include all actual costs incurred by the hospital in its rate setting formula as required by the statutory definition of "total patient care costs;" and (c) as a consequence, the regulation prevents Affiliated from obtaining its statutorily guaranteed cost-to-charge ratio for FY 1978.

---

[16] The new regulation adopted by the Commission, 114.1 Code Mass. Regs. 8.00 (note 15, *supra*) uses part of the challenged 14 CHSR 11 methodology for calculating "budget year reasonable financial requirements" pursuant to the changing statutory mandates required by St. 1976, c. 409, §§ 5-8. We have been informed that a third action is now pending between the parties challenging the provisions of 114.1 Code Mass. Regs. 8.00.

A. *Use of a two year old base.* General Laws c. 6A, §§ 37 and 39, inserted by St. 1976, c. 409, provide respectively for Commission review of all applications for modification of hospital charges, and of all hospital budgets beginning with FY 1978. While both sections specify when the hospital must act in terms of requesting increased charges and submitting its budget for approval and when the Commission must respond,[17] neither section establishes any specific time frame into which the cost and data figures requested by the Commission must fit. Additionally, the only particular years mentioned in either section, besides the "applicable fiscal year" for which modification or budget approval is sought (in this case FY 1978), are the "base year," G. L. c. 6A, § 39, or the "base period of total patient care cost to total patient care charges," G. L. c. 6A, § 37, defined as "the twelve month period from April first, nineteen hundred and seventy-four, through March thirty-first, nineteen hundred and seventy-five." G. L. c. 6A, § 31, as appearing in St. 1976, c. 409, § 1. It is obvious then that there is no statutory requirement that the Commission consider data from any particular year in calculating the "ratio of total patient care costs to total patient care charges for the applicable fiscal year." G. L. c. 6A, § 37. The only statutory limitation in this regard is the one restricting the Commission from going back further than the statutory "base period" (i.e., April 1, 1974, to March 31, 1975).

However, it is equally apparent that the Commission, in order to establish rates for FY 1978, must start some-

---

[17] An application for a charge modification must be submitted by a hospital, "at least sixty days prior to the implementation of such modification ... [and] [a]pproval ... shall be deemed granted in the absence of written notification by the commission to the contrary ... within sixty days of such submission." G. L. c. 6A, § 37. The hospital's budget must be filed with the Commission "at least sixty days prior to the start of its fiscal year [October 1, 1977]" which "shall approve or disapprove in whole or in part" a budget with a cost-to-charge ratio not lower than ninety-five percent or the historic ratio presumably within the sixty-day period. G. L. c. 6A, § 39.

where and must compile data from a definite period of time prior to 1978 to make calculations bearing on FY 1978 as the "applicable fiscal year." As to the budget, the Commission is directed by § 39 to review a hospital's proposed budget "including projected and actual costs, volume and revenue data, the charge schedule supporting the revenue projection, and such other information as the commission shall require." G. L. c. 6A, § 39. As to charge modifications, § 37 requires the requested modifications to be supported by "a budget and projected actual costs, volume and revenue data." By its plain language then, the statutory scheme requires the Commission to consider a blend of actual as well as projected data, and also requires a final determination by the Commission as to both the budget and charge modifications no later than September 30, 1977. (See note 17, *supra.*) The Commission's primary source of actual data concerning total patient care costs is the hospital's payments under the Medicare program, which provides for retroactive reimbursements for a given fiscal year based on an audit undertaken six to twelve months after the close of that particular fiscal year. As a result during the period when the Commission statutorily must act upon budgets and applications for charge modifications for FY 1978, namely, the sixty-day period prior to October 1, 1977, the most recent figures available to it from Medicare audits will be the figures from FY 1976. This leads us to conclude, as did the judge below, that a base year for calculation of total patient care costs which is at least two years old[18] is both required and feasible in order that the Commission comply with the mandates of the statutory scheme. As a result, the use of FY 1976 as the base year by the Commission did not violate the provisions of St. 1976, c. 409, and Affiliated's first argument fails.

---

[18] Since the only years within which the Commission must work are the "base period year" of 1974-1975 and the "applicable fiscal year," there is nothing which bars using FY 1975 as a base year as well.

B. *Disallowance of some actual costs.* Affiliated asserts
that since it receives reimbursement from Medicare for
all reasonable actual costs incurred by it in providing
patient care services, that the Commission, in determin-
ing the cost to charge ratio required by G. L. c. 6A, §§ 37
and 39, must build into its definition and calculations of
"total patient care costs" all the actual costs experienced
by the hospitals in FY 1977. Since the Commission does
not consider all actually reimbursed Medicare costs, Af-
filiated maintains that its rate setting methodology is
flawed. Affiliated bases its assertion on the language con-
tained in St. 1976, c. 409, § 5, which provides that total
patient care costs for State rate setting purposes is to
mean "total patient care cost as defined for purposes of
Title XVIII, including part A and part B patient care
services, of the federal Social Security Act . . ." (Medi-
care).[19]

One would logically assume then that either the Medi-
care Act, or the regulations implementing it, contain a
crisp definition of total patient care costs, and that the
definition falls in line with Affiliated's assertion that
Medicare pays the actual costs found to be reasonable,
thereby requiring the Commission to do the same. But the
linkage desired by Affiliated is not present for several
reasons. The first is that a close reading of both the Medi-
care Act and the relevant regulations pertaining to it
reveals that a definition of "total patient care cost" does
not exist anywhere within the whole of the Medicare
legislation.[20] Medicare instead reimburses hospitals for
costs falling within certain categories, and the Commis-
sion includes all of the categories of Medicare defined
costs within its own calculations of the term "total pa-

[19] This reference expired on October 1, 1978, when the Commission
established its own definition of total patient care costs, as required
by St. 1976, c. 409, § 5.

[20] See generally 42 U.S.C. § 1395 et seq. (1976), 20 CFR 405.401 et
seq. (1977).

tient care cost." But another reason reveals even more dramatically why the Commission is not required to recognize all of the costs within a given Medicare category. Medicare's reimbursements are constrained only by the requirement that the cost be "reasonable." The restraints upon the Commission are different. The Commission is required by G. L. c. 6A, § 37, to adopt regulations controlling requested charge modifications which require the modifications to be supported by the reasonableness of the underlying costs and which also provide that the proposed increase in charges shall not be approved unless "(a) the increase proposed is consistent with the rate of inflation in the economy generally ... (b) any increase beyond that [so] allowed ... results from increase in volume not otherwise off-set by decreases in volume ... and (c) such increases, not otherwise justified by clauses (a) and (b), result from cost increases beyond the reasonable control of the individual hospital."

As a result, the Commission cannot allow any request for modification of hospital charges which is not clearly justified by factors of inflation, increased patient volume or costs beyond the control of the hospital. Moreover, even if such factors justify a charge increase, if the applicant hospital's ratio of cost-to-charges would be lower than ninety-five per cent,[21] "the Commission shall not approve any requested modification or part thereof, which would produce a ratio of total patient care costs to total patient care charges in the applicable fiscal year which is below the applicant hospital's base period of total patient care cost to total patient care charges," G. L. c. 6A, § 37. These statutory limitations upon a hospital's surplus income are additional indicators of the clear legislative purpose which pervades all of St. 1976, c. 409,

---

[21] The judge found as an undisputed fact that the difference between this ratio and 100% "represents a margin of surplus income available for purposes of, inter alia, working capital and capital replacement coverage of bad debt and free care."

and its predecessor, St. 1975, c. 424. That purpose is "to stabilize hospital charges . . . [and] to control the costs of purchasing hospital care in the commonwealth." St. 1975, c. 424 (preamble). The result is to give the Commission some leeway in its consideration of a hospital's actual costs.

We also think that the conclusion that the Commission does not have to accept actual costs incurred by Affiliated in 1977, but is free acting reasonably to disregard some and accept others, is made apparent by the relationship between costs and charges. Simply stated, the Commission in order to control charges, as the Legislature intended it to do, must have some ability to question the legitimacy of a hospital's costs.[22] An example of this correlation was brought out at the trial by evidence that the Peter Bent Brigham Hospital Division had overestimated

---

[22] One commentator has explained why this is necessary: "The delivery of hospital care is marked by four characteristics which free it from market control and thus make it impervious to the constraints which normally regulate prices — [f]irst over 91 percent of all hospital bills are paid by so-called third-party payors —; [s]econd, most third-party payors . . . compensate hospitals not according to prospectively established charges or fees, but according to a retrospective analysis of the cost of services rendered; [t]hird, the delivery of hospital services is dominated by institutions not motivated by profit considerations. Nonprofit hospitals may adopt and pursue their own institutional goals as long as their operating revenues, plus gifts and endowment income, balance expenses . . .; [f]ourth, because patients frequently lack the knowledge to determine their actual medical needs, their demand for hospital services is heavily influenced by physicians whose personal interests favor a high level of services. These deviations from the classical economic model go far toward explaining both the rapid growth of and the continued excess supply in the hospital sector . . . [while] the high frequency of cost reimbursement permits these administrative luxuries by assuring hospitals a recovery of the expenses incurred to acquire and maintain underutilized facilities." Note, Hospital Cost Control: Single-Edged Initiatives for a Two-Sided Problem, 15 Harv. J. on Legislation 603, 610-612 (1978). It is the Commission's contention that unrestricted reimbursement of all actual costs would defeat the clear legislative purpose to control charges for hospital services in light of the unusual economic factors that influence hospital costs and charges.

its increase in patient volume for 1977.[23] The hospital expended unspecified sums for the expected increase in patient volume, which was part of the approximately $1.8 million in actual costs for FY 1977 which Affiliated was not allowed to recognize under 14 CHSR 11. Yet there is no reason why costs incurred for unnecessary expansion of services should be passed on to the consumer via charge modifications in FY 1978, when there is no statutory language which requires the Commission to build into its definition of "total patient care costs" this type of actual expenditure by the hospital.

Finally, a review of the legislative history of c. 409 is also instructive in evaluating the Commission's contention that it was required to control costs as part of its duty to contain spiraling hospital charges, thereby calling for a treatment of a hospital's costs different from Medicare treatment of those same costs. We are particularly impressed with the facts of legislative history which indicate that the Commission was the first to propose legislation which would control hospital charges to the Governor, and it was the Commission's proposal which was submitted almost verbatim to the Legislature and adopted as St. 1975, c. 424.[24] The permanent hospital charge control legislation contained in St. 1976, c. 409, which replaced St. 1975, c. 424, was also designed in large part by the Commission. The Commission's chairman was in-

---

[23] The Commission asks the hospitals to provide data as to actual and expected patient volume as part of their submissions.

[24] Chapter 424 of St. 1975 was titled "An Act establishing a temporary system for the review of charges for the purchase of hospital care in the Commonwealth;" in § 2, it provided for a review of hospital charge modifications substantially similar to the provisions of G. L. c. 6A, § 37, and required the Commission to "issue regulations setting forth the procedure and substantive standards to be applied in reviewing applications for approval of modifications in charges;" in § 10, it required the Secretary of Human Services to submit "a proposal for a comprehensive system for controlling the costs of purchasing hospital care in the commonwealth" by October 1, 1975; and in § 9, it provided for its own expiration date of January 31, 1977.

strumental in drafting both pieces of legislation as well as regulation 14 CHSR 11, and, in giving testimony to the Legislature as to the purpose of the legislation, he emphasized the point that in order to control rising hospital expenses it was necessary to control both costs and charges.[25] The Commission also provided information and technical assistance to other States considering similar brakes on hospital charges and its chairman had worked with the Federal task force which had developed the President's proposal for a Federal hospital cost control bill.

So both c. 409 considered as a whole and its legislative history point to the conclusion that the Commission need not and should not build into its definition of "total patient care costs" all the actual costs incurred by a hospital in any given fiscal year. Any other conclusion would tend to nullify several provisions of an elaborate statute, which was intended to establish a progressive series of limitations upon hospital charges over a period of time.[26] "A statute should be construed to avoid rendering its words meaningless." *Commonwealth* v. *Wade*, 372 Mass.

---

[25] At trial the chairman testified, "I made a series of recommendations to the Governor early in 1975 with respect to the need for developing a control of hospital charges as a means of controlling the rise of hospital costs that we have been experiencing for the prior years . . . . I made a series of recommendations to the Governor on how to impact on hospital cost increases . . . . The nature of the recommendations were to develop a regulatory system, a control system, of hospital charges, because since charges at that point had not been regulated, they provided a source of income revenue for the hospitals which the hospitals spent and, therefore, had a direct impact on the increase in hospital costs."

[26] General Laws c. 6A, § 37, established procedures which were applicable beginning with FY 1977; this section became void after the adoption of regulations required by St. 1976, c. 409, § 5, no later than October 1, 1978. General Laws c. 6A, § 39, required budget review beginning with FY 1978, while G. L. c. 6A, § 40, required the development of a methodology for comparing and grouping hospitals as of FY 1979. From its inception, c. 409 contemplated an evolving system of charge control regulations.

91, 95 (1977), and cases cited. We decline to ignore the language of c. 409 by requiring the Commission to recognize all of the hospital's actual costs.

C. *Cost to charge ratio.* Affiliated asserts that the definition and methodology utilized by the Commission to determine "total patient care costs" prevents it from reaching its statutorily guaranteed base period ratio.[27] However, this argument echoes the assertion just discussed that the Commission is ignoring actual costs in its formula which it has a duty to recognize.[28] Since we have concluded that the Commission does not have to accept the hospital's actual costs, we discuss this assertion no further.

3. *Does 14 CHSR 11 involve retroactive rate setting?* Affiliated asserts that 14 CHSR 11 violates the judgment in *Affiliated I* which enjoined certain provisions of the prior regulation allowing the Commission to recapture excess revenue from a previous fiscal year through revenue disallowance in the hospital's current fiscal year. In effect, the application of 14 CHSR 9 enabled the Commission to reopen the previous year's ratio of costs to charges when actual cost data became available and created a retroactive system of charge review similar to that employed for cost-reimbursements under the Medicare system. The judge in *Affiliated I* ruled that G. L. c. 6A, §§ 37 and 39, require the Commission to engage in a prospective system of charge review.[29] We examine the methodology employed by 14 CHSR 11 to determine whether it is, in fact, prospective.

---

[27] The ratio is obtained by dividing the FY 1978 total patient care costs by total patient care charges.

[28] It is undisputed that if the Commission's definition of "total patient care costs" is correct, 14 CHSR 11, § 11.123, expressly permits a hospital to maintain its proper ratio of total patient care costs to total patient care charges.

[29] See note 2, *supra.*

The Commission carries out a multistep calculation to determine budget year (FY 1978) total patient care costs. 14 CHSR 11, § 11.123. Basically the methodology is as follows: first the hospital's FY 1976 ("base year") allowed costs are determined by reference to the Medicare reimbursements for that year. This figure is adjusted by (1) a 1977 inflation figure (actual inflation experienced for the first eight months of FY 1977 plus a projected inflation rate for the remaining four months), and (2) a figure to reflect changes in costs caused by increased volume of service charges (based on data provided by the hospital for eight months' actual and four months' projected costs). The lower of this adjusted figure, or the FY 1977 allowed patient care costs (representing eight months' actual and four months' projected costs) becomes the allowed level of total patient costs for FY 1977 (styled as the "intermediate year"). This FY 1977 figure is trended forward for FY 1978 to reflect projected inflation for FY 1978, projected change in volume (hospital estimates) and costs beyond control.[30] Then FY 1978 "total patient care costs" are considered as the lower of the adjusted FY 1978 costs or the level of FY 1978 costs projected by the hospital in its own budget. The Commission then divides these FY 1978 total patient care costs by the total patient care charges (projected total gross earnings of the hospital) to arrive at the FY 1978 cost-to-charge ratio.

We note first that this methodology does not involve itself with an extensive analysis of the hospital's previous years' revenues or ratios, factors which were major in-

---

[30] 14 CHSR 11, § 11.55, provides for seven categories of cost beyond hospital control which include costs generated by government requirements, costs generated by increase in insurance premiums, costs generated by disaster losses in excess of insurance, and "costs generated by severe financial hardship solely related to the charge review system mandated by Chapter 409 of the Acts of 1976. A severe financial hardship must be such that the financial stability of the hospital is imminently threatened." 14 CHSR 11, § 11.55(g). We note that Affiliated claimed no cost beyond control under subsection (g).

gredients of the regulation whose application was enjoined by the judgment in *Affiliated I*. Significantly, the Commission has also abandoned any element of "recapture" of income and any attempt to reopen previously settled rates. It was primarily the recapturing of excess income which gave the prior regulation its retroactive effect.

We also find that the present regulation acts prospectively based on the persuasive comments made by the United States Court of Appeals for the First Circuit concerning the Commission's method for setting Medicaid reimbursement rates. The Medicaid formula employed by the Commission is somewhat simpler than 14 CHSR 11 but is substantially similar in operation. It uses a base year two years prior to the fiscal year being reviewed and an analysis reasonably comparable to the regulation at issue in this case. In *Massachusetts Gen. Hosp.* v. *Weiner*, 569 F.2d 1156 (1st Cir. 1978), the formula which established Medicaid rates was said to be prospective in operation. Since the two formulae are essentially the same, we conclude, after a careful comparison of the judgment in *Affiliated I* and the mechanics of 14 CHSR 11 set forth above, that the Commission's methodology is prospective in operation despite the use of historical and adjusted data, and that it does not violate the enjoinders set out in *Affiliated I*.

In summary, the Commission's methodology for regulating hospital charges contained in 14 CHSR 11 is a "reasonable construction of a regulatory statute adopted by the agency charged with . . . [its] enforcement," *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 n.22 (1972), quoting *Investment Co. Inst.* v. *Camp*, 401 U.S. 617, 626-627 (1971). Regulations such as 14 CHSR 11 are entitled to great weight "where, as here, (1) the statute itself vests broad powers in the agency to fill in the details of the legislative scheme . . .; (2) the agency has participated in the actual drafting of the legislation . . .; and (3) the interpretation at issue has been consistently

applied." *Amherst Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 492 (1978). Overall we conclude that the regulation did not clash with the enabling statute, or with the judgment in *Affiliated I*, that it was prospective in operation, and that it constituted a reasonable and functional implementation of a strongly stated legislative policy to control hospital charges.

*Judgment affirmed.*