Brookline *v.* Medical Area Service Corp.

Town of Brookline & others[1] *vs.* Medical Area
Service Corporation & others.[2]

Suffolk.    May 23, 1979. — August 13, 1979.

Present: Goodman, Rose, & Greaney, JJ.

*Public Health. Department of Public Health*, Certificate of need.
*Health Care Facility. Statute*, Construction. *Words*, "Health care
facility."

Legislative history of G. L. c. 111, §§ 25B-25G. [249-254]

An energy plant to provide electricity, steam, and chilled water to the
members of a corporation, including several health care facilities,
was not part of a health care facility subject to the provisions of
G. L. c. 111, §§ 25B-25G. [254-256]

A determination by the Department of Public Health that construc-
tion of an energy plant to serve members of a corporation, including
several health care facilities, was not subject to the provisions of
G. L. c. 111, §§ 25B-25G, because the plant was not legally, adminis-

[1] Additional plaintiffs are eleven taxpayers of the town of Brookline.
The defendants challenge the plaintiffs' standing to bring the suit as
a ten-taxpayer suit principally because of the town's presence as a
plaintiff. They allege that a municipal corporation cannot be a taxpay-
er. There is standing to bring this action under the provisions of G. L.
c. 111, § 25G, which permits ten taxpayers to enforce the provisions
of that statute, without regard to the status of the town.

[2] Additional defendants are the Medical Area Total Energy Plant,
Inc. (MATEP), the President and Fellows of Harvard College (Har-
vard), L. Edward Lashman, Jr., vice president of MATEP and director
of external projects for Harvard, the Commissioner of Public Health,
the Department of Public Health, and the member institutions of the
Medical Area Service Corporation, consisting of the Affiliated Hospi-
tals Center, Inc. (Boston Hospital for Women, Peter Bent Brigham
Hospital, and Robert B. Brigham Hospital), Beth Israel Hospital As-
sociation, Children's Hospital Medical Center, Sidney Farber Cancer
Center, Inc., New England Deaconess Hospital, Joslin Diabetes Foun-
dation , Inc., and Massachusetts College of Pharmacy, as well as Har-
vard on behalf of its medical, dental, and public health schools.

tratively, physically, financially, or functionally a part of a health care facility was reasonable. [256-259]

CIVIL ACTION commenced in the Superior Court on March 20, 1978.

The case was heard by *Donahue, J.,* on a motion to dismiss.

*David Lee Turner & Isaac H. Braddock* for the town of Brookline & others.

*Thomas Miller,* Assistant Attorney General, for the Department of Public Health & another.

*Robert W. Meserve (Verne W. Vance, Jr.,* with him) for the Medical Area Service Corporation & others.

GREANEY, J. By statute,[3] a substantial capital expenditure cannot be made for the construction of any part of a health care facility without a prior administrative determination by the Department of Public Health (department) that there is a need for the facility. The Medical Area Total Energy Plant, Inc., an urban renewal corporation formed pursuant to G. L. c. 121A, is in the process of constructing a total energy plant (plant or project) on land owned by Harvard in Boston. The plant is designed to provide electricity, steam, and chilled water to the members of the Medical Area Service Corporation (MASCO), several of which are health care facilities (see note 2, *supra*). The plant would replace the existing Harvard steam plant on Blackfan Street, which presently supplies part of the energy requirements of some of the MASCO institutions but which is, or will be, increasingly inadequate to meet these requirements. In addition, the project will provide some nonelectrical services, free of charge, to the nearby publicly assisted Mission Park Housing Project. The plaintiffs filed an action in the Superior Court pursuant to the provisions of G. L. c. 111, § 25G,[4] against MATEP, MASCO, MASCO's members

---

[3] General Laws, c. 111, §§ 25B-25G, inserted by St. 1972, c. 776, § 3, and popularly known as the determination of need law.

[4] This section of the statute permits ten taxpayers, and certain pub-

(collectively referred to as the private defendants), the department and the Commissioner of Public Health (public defendants), seeking orders to halt the construction of the plant and to compel a determination of its need by the department pursuant to the provisions of G. L. c. 111, § 25C.[5] All the defendants moved to dismiss the complaint under Mass.R.Civ.P. 12 (b) (6), 365 Mass. 755 (1974).[6] A Superior Court judge allowed all the motions without opinion and entered judgments dismissing the action.[7]

lic health agencies, to bring suit to enforce the provisions of the determination of need law.

[5] The complaint alleged that the plant was a part of a health care facility as that term is used in G. L. c. 111, § 25B, as amended by St. 1975, c. 881, § 3, which, in so far as material, reads as follows:

"'Health care facility', a hospital, institution for the care of unwed mothers or clinic, as defined in section fifty-two; a long-term care facility, which is an infirmary maintained in a town, a convalescent or nursing home, a rest home or a charitable home for the aged, as defined in section seventy-one; a clinical laboratory subject to licensing under chapter one hundred and eleven D, a public medical institution, which is any medical institution, and, after December first, nineteen hundred and seventy-two, any institution for the mentally ill or retarded, supported in whole or in part by public funds, staffed by professional, medical and nursing personnel and providing medical care, in accordance with standards established through licensing, approval or certification for participation in the programs administered under Titles 18 and 19 of the Federal Social Security Act, by the department; and any part of such facilities. . . ."

[6] The private defendants moved to dismiss, primarily on the ground that the plant did not involve construction of a health care facility; the public defendants claimed that as to them the complaint failed to state that they had done anything that they were prohibited by law from doing or that they failed to do anything that they were required by law to do.

[7] The record indicates that the parties brought to the motion judge's attention various materials outside of the complaint, including, inter alia, affidavits, a letter from Harvard requesting an advisory ruling from the department pursuant to the provisions of G. L. c. 30A, § 8, that the plant was not subject to determination of need procedures, and the department's advisory ruling issued after that request. These materials converted the private defendants' motion to dismiss into one for summary judgment under the provisions of Mass.R.Civ.P. 56(b), 365 Mass. 824 (1974). The judge, by not excluding the materials, treated the motion in that posture. It also appears from the record and

We affirm the result, modifying the judgment as to the private defendants to reflect the consideration of their motion as a rule 56 motion.

The relevant undisputed facts are these. On April 2, 1975, Harvard's financial vice president wrote to the department requesting an advisory ruling pursuant to the provisions of G. L. c. 30A, § 8,[8] and the department's own regulations,[9] that the proposed energy plant which Harvard intended to build on its land in the vicinity of the Harvard Medical School would not be subject to the department's jurisdiction. The letter outlined the anatomy of the project in this fashion: the plant would be constructed and owned by MATEP, and MATEP's stock in turn would be owned either 100% by an affiliate of First National City Bank of New York (Citicorp), or alternatively, 80% by Citicorp and 20% by Harvard. The construction financing would be provided or arranged for by Citicorp and the permanent loan (approximately 80% of the construction total) would be borrowed from insurance companies or other institutional lenders. After construction MATEP would lease the plant to MASCO, which

---

general agreement at argument by the plaintiffs and the private defendants that there was no objection to proceeding under that rule. That the judgments as entered were mislabelled, however, does not affect that result or the result we reach on essentially undisputed facts. See *Capodilupo* v. *Petringa*, 5 Mass. App. Ct. 893 (1977).

[8] General Laws c. 30A, § 8, permits an agency such as the department to make, on request of any interested person, an advisory ruling with respect to the applicability of any statute or regulation enforced or administered by the agency.

[9] The department's regulations specifically provide that anyone in doubt as to whether a determination of need is required for a project should request an advisory ruling. Otherwise, by submitting an application for a determination of need, the person will be deemed to have submitted to the department's jurisdiction. Harvard, in requesting a preliminary ruling, was specifically following the procedure established by the department for an advisory predetermination on the application of the statute to the plant. 13 Code Mass. Regs., Part 9, Massachusetts Determination of Need Regulations, Part 4.7, at 1215 (1975).

would operate it for approximately thirty-five years,[10] until MATEP's indebtedness on the permanent loan should be discharged. Under requirements contracts with each of its members, MASCO would agree to provide, and each of the members would agree to receive and pay for, all their electricity, steam, and chilled water to the extent that the plant should be able to supply them. It was not contemplated that any member would pay for utilities it would not use. After the MASCO lease terminates and the indebtedness of MATEP is discharged, Harvard will have the option to purchase the plant from MATEP at fair market value. Harvard is informally related to the other MASCO members (with the exception of the Massachusetts College of Pharmacy) because it uses their facilities and their staffs for the clinical instruction of Harvard Medical School students and to further its interest in medical research. Thus, at the time of its request for an advisory ruling, it was contemplated that Harvard (which had proposed the plant after extensive studies of the existing and future energy requirements of the institutions) would exercise its option to purchase the plant and agree thereafter to continue to make utilities available to members at Harvard's cost.

Based upon the presentation made to it by Harvard as to the details of plant construction, ownership, and operation, the department on August 18, 1975, issued the requested advisory ruling to the effect that the plant would not be "part of" an existing health care facility, that the department had no jurisdiction over the pro-

[10] MASCO's functions are not related solely to management of the plant. Additionally, it seeks to assist medical and educational institutions in carrying out their charitable and educational functions more effectively and efficiently; it coordinates parking facilities for member institutions, administers a central elevator maintenance contract, provides engineering services, coordinates area planning activities, and studies proposals for more economic management, such as the provision of a common security force and an inter-institutional central telephone system.

posed project, and that construction could proceed without application for or receipt of a determination of need. On October 9, 1975, the plant received approval from the Boston Redevelopment Authority·(BRA) as a privately initiated urban renewal project under the provisions of G. L. c. 121A, and on October 6, 1977, amendments to the project's original c. 121A application were approved by the BRA. Extensive litigation instituted by Boston Edison Company followed on the heels of the BRA's approval of the plant as an urban renewal project, all of which was concluded favorably to the plant's construction.[11] The project is now well under way, and by April 6, 1978, more than forty-two million dollars had been expended on land acquisition and the plant's construction. With the facts thus summarized, we turn to the substantive issues raised by the appeal.

The parties differ sharply as to the type of project that should be considered as part of a health care facility for purposes of the application of G. L. c. 111, §§ 25B-25G. The plaintiffs seek an expansive reading of the phrase "any part of" a health care facility (G. L. c. 111, § 25B), so that virtually any project undertaken by the health care institutions mentioned in the statute, no matter where located or however owned, would require a determination of need. The private defendants, on the other hand, read the statute restrictively and argue that it applies only to the construction of strictly medically oriented patient care facilities, such as expanded clinical services or additional bed space. With these contentions in mind, we proceed to examine relevant legislative history and the department's administrative ruling ultimately concluding that this particular project does not constitute part of a health care facility.

---

[11] The saga of the prior litigation is chronicled in two decisions of the Supreme Judicial Court, both entitled *Boston Edison Co.* v. *Boston Redevelopment Authy.*, and located respectively in 374 Mass. 37 (1977), and 376 Mass. 151 (1978).

1. *Relevant legislative history.* During its 1971 session the Legislature reacted to public concern over rising costs of health care by considering regulatory cost control techniques for large capital investments by hospitals and other health care institutions. The requirement of a prior administrative determination of need for new or expanded health care facilities was selected as an appropriate device to place controls on such costs.[12] Thus, St. 1971, c. 1080, the immediate predecessor of G. L. c. 111, §§ 25B-25G, was enacted as an emergency measure on November 15, 1971, "to provide forthwith for the prevention of unnecessary expansion of health care facilities...." Section 3 of the statute defined health care facilities subject to the law as noted in the margin,[13] and § 1 established departmental determination of need as a prerequisite to the construction, expansion, or major renovation of any part

[12] The concept of a determination of need embodied in St. 1971, c. 1080, was not at all a new idea as it applied to health care facilities in the Commonwealth. Issuance of original licenses for hospitals and clinics had been subject to determination by the department that there was need for such a facility at the intended location. A similar approach was implicit in the requirement that the department approve construction plans for facilities other than hospitals and clinics. Chapter 1080 extended the concept to place limitations on construction or changes in services by already licensed institutions. Interim Report of Joint Special Committee on Health Benefits and Health Services, 1972 House Doc. No. 5968, at 17-18. Useful background as to certificate of need legislation is contained in articles by Havighurst, Regulation of Health Facilities and Services by "Certificate of Need," 59 Va. L. Rev. 1143 (1973), and Blumstein & Sloan, Health Planning and Regulation Through Certificate of Need: An Overview, 1978 Utah L. Rev. 3.

[13] "As used in this act the term 'health care facility' shall include (1) a hospital, institution for the care of unwed mothers or clinic, as defined in section fifty-two of chapter one hundred and eleven of the General Laws, and (2) a public medical institution, which is any medical institution supported in whole or in part by public funds, either Federal, State, or Municipal staffed by professional, medical and nursing personnel and providing medical care, in accordance with standards established through licensing, approval or certification for participation in the programs administered under Titles 18 and 19 of the Federal Social Security Act, by the department of public health."

or the whole of a health care facility. Chapter 1080 contained a termination date of May 31, 1972; obviously it was designed to institute a temporary system of administrative controls over major construction by health care institutions while the Legislature gained some experience in the area, studied the effect of the temporary controls, and drafted more comprehensive permanent legislation.

In the same year that c. 1080 was adopted, the subject it addressed was referred, together with drafts of proposed permanent legislation,[14] to a Joint Special Committee of the House and Senate on Health Benefits and Health Services (committee). Ultimately, the committee drafted 1972 Senate Doc. No. 1500, which, with changes not relevant here, was enacted as St. 1972, c. 776, § 3, effective June 1, 1972, and codified as G. L. c. 111, §§ 25B-25G.

In connection with its study, the committee prepared a copious report (1972 House Doc. No. 5968) which indicated on the whole that the focus of legislative concern under G. L. c. 111, §§ 25B-25G, should be directed principally to the unnecessary expansion by health care institutions of their patient care facilities. A case in point was the committee's reference to the "proliferation of open-heart surgery facilities during the 1960's," described as "little used" and appropriate for "remedial action." House Doc. No. 5968, *supra* at 13-14. Particularly significant also were the committee's observations, noted fully in the margin, that it was adopting a narrow definition of institutions subject to the statute in order to "not unintentionally sweep into the process certain facilities which might best be excluded"[15] (*id.* at 23), and to set out suffi-

---

[14] There is no need to lengthen the text with summaries of the proposed bills except to note that all of them continued to define specifically the types of institutions that would be covered by the law (e.g., hospitals, clinics, nursing homes, and the like as well as a part of any such facility).

[15] "The Committee would have liked to have been able to recom-

cient policy guidelines to provide "reasonable bounds on its interpretation" by the agency administering it (*id.* at 26), "consistent with the fact that we are here dealing with a very fluid, evolving body of knowledge"[16] (*id.* at 27).

The report also catalogued all of the determination of need dispositions made under c. 1080 up to the time of the hearings. *Id.* at 57-67. This summary revealed that most of the projects considered by the department under the

mend, as subject to 'certificate of need' decisions, health care facilities where that term is defined in a broad, generic sense. Many of the present difficulties with our present Public Health Law (Chapter 111 of the General Laws) spring from the restrictive definitions of what is covered by that law. Its rigidity has led to many gaps in coverage, an inability to absorb developing institutional forms within its scope, and a lack of knowledge concerning certain types of presently-existing resources. It would have been preferred to have avoided this difficulty in our present recommendation. Unfortunately, it could not, principally due to our concern that we not unintentionally sweep into the process certain facilities which might best be excluded. As a result, we have limited the operation of our 'certificate of need' recommendation to those types of facilities covered by Chapter 1080, plus long term care facilities." 1972 House Doc. No. 5968, at 23.

[16] "Throughout this Committee's hearings, concern often was expressed by many persons that, whatever legislation follows Chapter 1080 should not be so explicit as to preclude adaptation to changing circumstances and changing perceptions of how best to accomplish the goals of the program. Another concern also was voiced, however, that sufficient policy guidelines be set forth in the statute to provide reasonable bounds on its interpretation by whatever agency administers the program. These views are regarded as not necessarily irreconcilable but as requiring a balancing process. In short, the question is: What should be in the statute; what can be left to the regulation-making power of the administering agency?

"The committee takes the position that only a very broad statement of policy guidelines should be included in certification of need legislation . . . . It also should be pointed out that the mere passage of legislation, however specific in its terms, cannot realistically be regarded as having solved any problem unless properly implemented by executive action. We prefer working with the Department to improve administration of the Act, rather than indulge in the false sense of accomplishment which springs from passage of a statute replete with bounds placed on executive action. Such an approach also is consistent with the fact that we are here dealing with a very fluid, evolving body of knowledge." 1972 House Doc. No. 5968, at 26-27.

temporary legislation concerned patient care services such as construction of a new pediatric wing[17] or a cancer center,[18] while a few dealt with projects incidental to hospital health care functions such as construction of a transformer vault,[19] and in one case, expansion of kitchen facilities.[20]

Finally, to complete the legislative history, G. L. c. 111, § 25B, was amended by means of St. 1975, c. 881, § 3, to add to the enumerated list of institutions subject to the law "a clinical laboratory subject to licensing under [G. L. c. 111D]." This last amendment rounded out the definition of a health care facility to its present form as set forth in note 5, *supra.*

An analysis of this legislative history leads to a number of conclusions. First of all, the legislative approach throughout has been to list specifically the types of patient care institutions which are "health care facilities," rather than to formulate a broad, generic definition of the term. In order to add a new facility not already listed in the statute — clinical laboratories — the Legislature deemed it necessary in 1975 to amend the list; a fact indicative of legislative wariness about "not unintentionally sweep[ing] into the process certain facilities which might best be excluded." 1972 House Doc. No. 5968, *supra* at 23. It is appropriate also to keep in mind the familiar rule of statutory construction that general language used in a statute following specific language in an enumeration is meant to cover only objects similar to those enumerated. 2A Sands, Sutherland Statutory Construction

---

[17] Applied for by Newton-Wellesley Hospital in April, 1972, at an estimated cost of $200,000.

[18] Applied for by Massachusetts General Hospital in April, 1972, at an estimated cost of $16,991,653.

[19] Applied for by Boston Children's Hospital Medical Center in March, 1972, at an estimated cost of $440,000.

[20] Applied for by New England Medical Center in March, 1972, at an estimated cost of $294,038.

§ 47.17 (1973). The combination of this rule with the specific enumeration of institutions subject to the law and the content of the 1975 amendment indicate that the words "part of a health care facility" were not meant to include every project built by or for a health care institution under the statute's coverage. As aptly and succinctly observed by Mr. Justice Brandeis, "[f]ew laws are of universal application." *Truax* v. *Corrigan*, 257 U.S. 312, 355 (1921) (dissenting opinion).

With this in mind, we think a reasonable reading of the statute would require a prior administrative determination of need for all new construction and all major renovations or expansions by health care institutions which create new, or augment existing, patient care services. For example, a hospital's decision to build a new wing to increase its bed space, or to add a thoracic surgery unit where it previously had none, would clearly need prior approval by the department. We also think it likely that a determination of need would be required for any major hospital project not directly linked to patient care services if it would constitute an integral part of the hospital's plant. Thus, if a hospital decided to build its own standby generator or central air conditioning system, it might require a certificate of need because the project would be an integral part of the total plant, and, therefore, part of a health care facility. Under some circumstances, an energy plant built for, and belonging exclusively to, a hospital might fall within the coverage of the statute.

However, we also perceive in the legislative history an intention to allow health care facilities some degree of flexibility in determining their operational necessities — albeit under the department's watchful eye. It cannot be said that the legislation was attempting to control *all* health care costs,[21] nor did it seek to discourage *some*

---

[21] In this regard, G. L. c. 6A, §§ 31 et seq., should be noted. This statute establishes the Health Services Rate Setting Commission and provides a statutory scheme for controlling hospital costs and charges.

measure of institutional free enterprise on the part of hospitals, which, if prudently exercised, might result in a lowering of costs, ultimately benefiting the consumer. Also, the department's role was to be a major one both in defining the contours of the statute, and in considering its applicability on an ad hoc basis to projects that did not fit traditional norms.[22] As noted in the margin, the Legislature, if it wished to include the type of project under construction here, could have easily done so, as the Congress did in comparable Federal health planning legislation enacted prior to the 1975 amendment to G. L. c. 111, § 25B.[23]

To fall under G. L. c. 111, § 25B-25G, then, a project which will service health care institutions must bear a substantial nexus to the institutions. That nexus must arise from some combination of functional, legal, administrative, and operational ties between the project and the institutions that leads to the conclusion that it is an integral part of the institutions it services. The energy plant under consideration in this case (as the agency found) lacks those connections. It is physically located

---

See generally *Affiliated Hosps. Center, Inc.* v. *Rate Setting Commn.*, 7 Mass. App. Ct. 563 (1979).

[22] The department's role as visualized by the Legislature in shaping policy under the statute is discussed in more detail in part 2 of this opinion, which treats the department's advisory ruling.

[23] Congress enacted the National Health Planning and Resources Development Act, P.L. 93-641, 88 Stat. 2225 (1974), 42 U.S.C. § 300k-t (1976), on January 4, 1975. In that legislation it included, as covered under the term "hospital," "related facilities, such as . . . central service facilities, operated in connection with hospitals . . . " 42 U.S.C. § 300s-3(3) (1976). We can assume that the Legislature was aware of this definition in the Federal legislation prior to the 1975 amendment to G. L. c. 111, § 25B, adding clinical laboratories to the list of covered institutions, because the Federal act requires State participation similar to the determination of need provisions as a prerequisite to Federal assistance, and because the Legislature by means of St. 1977, c. 945, § 6, inserted a second § 25H as part of the determination of need law, which specifically referred to regulations adopted pursuant to the Federal law.

apart from the health care facilities and will provide a significant share of its energy services to nonhealth care facilities such as the Massachusetts College of Pharmacy, certain schools at Harvard, and the Mission Park Housing Project. Moreover, it will be constructed by a G. L. c. 121A corporation (MATEP), which is not a health care facility; leased to and operated by a corporation (MASCO) which is not a health care facility; financed by the provision of equity capital to MATEP and the guaranty of MASCO's loan by a corporation (Harvard) which is not a health care facility; and ultimately will be subject to purchase by Harvard. The plant is substantively no different from an energy plant built to service MASCO's members and leased to MASCO by Boston Edison. No one would seriously maintain that a plant built by Boston Edison under similar circumstances would require a determination of need. We conclude that this plant is not part of a health care facility subject to the provisions of G. L. c. 111, §§ 25B-25G.

Finally, we are not dissuaded from this conclusion by the plaintiffs' argument that the statutory policy of G. L. c. 111, § 25C (that the "department ... encourage appropriate allocation of private and public health care resources ... so that adequate health care services will be ... available ... at the lowest reasonable aggregate cost") will be frustrated if we do not hold this plant subject to a determination of need. The brief answer to this contention is that if the plant is not covered by the definition adopted by the Legislature, no purpose of the statute can be frustrated by its omission, particularly where the statute's history indicates that the Legislature consciously chose to limit the determination of need concept. Nor do we find merit in the contention that public policy is being frustrated by allowing the half-completed plant to proceed. In this regard, we observe that the National Health Planning and Resources Development Act specifies two of its national health priorities in the formulation of national health planning goals to be: "[t]he development of

multi-institutional arrangements for the sharing of support services necessary to all health service institutions" (42 U.S.C. § 300k-2[5] [1976]) and "[t]he promotion of an effective energy conservation and fuel efficiency program for health service institutions to reduce the rate of growth of demand for energy" (42 U.S.C. § 300k-2[11]).[24] This project acts in furtherance of both of these commendable policy goals.

2. *The agency ruling.* The department's ruling issued on August 18, 1975, buttresses our conclusion. In the ruling the department explained that neither the statute nor its own regulations provided any express guidance as to how the phrase "part of a health care facility" should be interpreted in light of the facts contained in Harvard's letter. Because of the absence of statutory or regulatory precedent on the point, the following test was adopted: "the Department has looked to see whether the project was legally, administratively, financially, physically, and, in terms of its services, so intertwined with the particular facility that it would be appropriate to view it functionally as part of the health care facility."

The department pointed out that before it promulgated the determination of need regulations, the Public Health Council (which by virtue of c. 111, §§ 2, 3, acts as its advisor) had, on an analogous issue, considered and rejected the inclusion of professional office buildings (built in connection with a hospital) within the phrase "part of a health care facility."[25] Applying the criteria specified

---

[24] The "total energy plant" concept claims to utilize byproducts of its energy production which would otherwise be wasted; for example, the plant expects to produce some of its steam as a byproduct of its production of electricity, using the hot gases from the engine generators.

[25] In the ruling the department stated at n.2:

"It should be pointed out that when it was considering the recently promulgated certificate of need regulations, the Public Health Council did express a reticence about broadening a common sense definition of 'part of health care facility' and, accordingly, chose temporarily not to include professional office buildings within its jurisdiction under

above to the information furnished by Harvard in gener-
ally the same manner as we have, the department con-
cluded that it would be inappropriate to consider the proj-
ect subject to the statute,[26] because the plant was not
"legally, administratively, financially, physically, and . . .
functionally [a] part of [a] health care facility."

The plaintiffs maintain, however, that the depart-
ment's own regulations were intended to cover utility
projects such as the plant. They refer us to the Massa-
chusetts Determination of Need Regulations, Part 5 (37)
("unique application"), as amended, 19 Mass. Register at
7 (August 26, 1976). That section provides in subpart (d)
for a unique determination of need application for "a
project which is inherently not comparable in nature and

---

the certificate of need law. Professional office buildings are similar to
the Plant in that they are not, themselves, "health care facilities"
under s. 25B but only would be viewed as such if considered part of an
existing health care facility. This decision by the Public Health Coun-
cil has, naturally, been given great weight in the present advisory
ruling."

[26] The department spelled out six specific reasons for its conclusion:

"(1) The Plant will be constructed by a corporation (the '121A Corpo-
ration') which is not itself a health care facility;

"(2) Title to the Plant will not be in the name of any health care
facility but rather will at all times during the term of the lease remain
in this same '121A corporation';

"(3) A corporation other than any health care facility (i.e., MASCO)
will be responsible for the operation and administration of the Plant
and will be bound by whatever limitations are imposed on it by its own
corporate charter and by-laws;

"(4) Even though MASCO has a majority of members who are them-
selves health care facilities, an analysis of the transaction as a whole
indicates that Harvard University, which is not itself a health care
facility, appears to be the truly necessary party in the arrangement:
thus, for example, Harvard may provide twenty percent of the equity
in the '121A Corporation'; and, Harvard will guarantee the lease;

"(5) Moreover (and this is of prime significance to the Department)
at the conclusion of the lease, Harvard — and not MASCO or any of
the member hospitals — will have the option to purchase the Plant;

"(6) Finally, the individual hospitals will be purchasing utilities
from this Plant in a manner similar to and with accounting treatment
similar to the way they would were Boston Edison rather than the
'121A Corporation' constructing the Plant."

is concerned solely with construction involving heating, ventilation, parking, dietary services, administrative services, or similar equipment, services, or facilities; provided, that such construction is consistent with the existing scope of health care services offered by the applicant, and further that the project is not directly related to the medical care or treatment of patients." Any measure of apparent inconsistency between this particular regulation and the ruling as to the energy plant is reconciled by viewing the regulation (as the department apparently did) as applying to on site construction of special projects integrally related to the functioning of the health care institutions they service, such as the examples previously mentioned of a standby generator or a central air conditioning system; but as not applying to the distinct venture embodied in this plant, separated as it is at arm's length from the health care facilities to which it will supply energy. In our opinion, this regulation, and the law it implements, were not designed to stifle a hospital's ingenuity in seeking out a cheaper energy supply from a private source.

"While an administrative or executive interpretation cannot bind the courts, weight should be given 'to any reasonable construction of a regulatory statute adopted by the agency charged with ... [its] enforcement.'" *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 n.22 (1972), quoting *Investment Co. Inst.* v. *Camp*, 401 U.S. 617, 626-627 (1971). *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 491 (1978), and cases cited. In the absence of any conflicting legislative history or language in the statute to contradict the department's determination, we find that determination to be reasonable. See *Lewis* v. *Richardson*, 428 F. Supp. 1164, 1169 (D. Mass. 1977). Indeed, with express legislative indication that the department was to play an important role in implementing the statute's purposes, the conclusion reached by the department that the MATEP-MASCO project was not subject to a determina-

tion of need is entitled to particular deference by the courts. Thus, the legislative background of the statute and the administrative handling of its policies converge to a common point: that the construction of this project does not require a prior determination of need.

3. *Disposition.* In the context of this case, the plaintiffs' action under § 25G of c. 111 against the private defendants is similar to an action for declaratory relief seeking a determination as to whether the energy plant was subject to prior regulatory approval. Because of this and the rule 56 aspects of the case, an appropriate disposition requires that the judgment of dismissal as to those defendants be vacated. In its place is to be substituted a new judgment as to the private defendants, determining that the plant under construction is not subject to the provisions of G. L. c. 111, §§ 25B-25G. The judgment dismissing the action as to the public defendants is to stand as entered.

*So ordered.*